UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
———

WILLIE WASHINGTON,

          Plaintiff,                   Case No. 2:25-cv-11

v.                                    Honorable Hala Y. Jarbou

UNKNOWN WOODARD et al.,

          Defendants.
_____/

**OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis* in a separate order. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, after dismissing some defendants due to misjoinder, the Court will dismiss Plaintiff's complaint for failure to state a claim. Plaintiff's motion for summary judgment (ECF No. 7) and Plaintiff's motion to schedule mediation or trial (ECF No. 9) will be denied as moot.

**Discussion**

I. **Factual Allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan. The events about which he complains occurred at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan and the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan. Plaintiff sues URF Assistant Deputy Warden Unknown Clark; URF Corrections Officers Woodard, Kinsella, and Ellison; and IBC Corrections Officer Unknown Valdez. Plaintiff also lists "Unknown C/O" as a defendant in the caption of his complaint.

Plaintiff alleges that on July 21, 2023, he was transferred to URF. (Compl., ECF No. 1, PageID.5.) He was assigned to cell 215 in Round Unit. (*Id.*) That first day, Plaintiff asked non-party Corrections Officer Miller to move Plaintiff to a different cell because his younger cellmate consistently yelled out the cell door and beat on the desk singing rap. (*Id.*) Unidentified corrections officers mocked and laughed at Plaintiff and advised him that the "PC" (i.e., prison counselor), a non-party, was the one who made cell changes. (*Id.*) Plaintiff placed a kite in the PC's mailbox. (*Id.*)

The next day, Plaintiff was called out to see the PC. (*Id.*) Plaintiff asked to be moved to another cell. (*Id.*) The PC refused the move and stated that it was the C/Os that made cell changes. (*Id.*) The requests to move and refusals went "on and on."(*Id.*)

On August 24, 2023, Plaintiff returned to his cell from the law library. (*Id.*) Plaintiff's cellmate informed Plaintiff that Defendant Kinsella had revealed the crime for which Plaintiff was incarcerated: criminal sexual conduct. (*Id.*) Plaintiff's cellmate insisted that Plaintiff leave the cell and not return. (*Id.*) They argued. (*Id.*) Plaintiff left for medline and his cellmate advised Plaintiff not to return. (*Id.*)

2

On the way to medline, Plaintiff stopped at the officer's desk and advised Defendant Woodard of the "conflict" between Plaintiff and his cellmate. (*Id.*, PageID.6.) Defendant Woodard told Plaintiff to go to medline. (*Id.*) Upon Plaintiff's return, Defendant Woodard instructed Plaintiff to sit in the dayroom next to the officer's desk with Plaintiff's "chow for the night." (*Id.*)

Plaintiff started to eat. (*Id.*) Then, Defendant Ellison entered the dayroom and instructed Plaintiff to return to his assigned cell. (*Id.*) Plaintiff told Defendant Ellison that Defendant Woodard had advised Plaintiff to sit in the dayroom. (*Id.*) Defendant Ellison looked back at Defendants Woodard and Kinsella. (*Id.*) When Defendant Ellison turned back to Plaintiff, Ellison smiled and gave Plaintiff a direct order to return to his cell. (*Id.*)

Plaintiff returned to the cell and started packing his belongings. (*Id.*) The cell door was open for ten to fifteen minutes "for yard for the unit." (*Id.*) Plaintiff placed his green duffle bag by the cell door. (*Id.*) Plaintiff's cellmate left the cell. (*Id.*) As Plaintiff gathered his remaining items, "the guy from the cell across the hall" entered Plaintiff's cell and struck Plaintiff in the head with a lock in a sack. (*Id.*)

Plaintiff managed to fend off the attacker's other blows and, ultimately ended up in a fist fight with the attacker. (*Id.*) As Plaintiff gained the upper hand, his attacker said that he was sent to get Plaintiff "off the yard and lockup." (*Id.*, PageID.7.) Plaintiff does not report who "sent" the attacker.

Defendants Kinsella and Ellison then arrived at Plaintiff's cell. (*Id.*) Plaintiff was "sprayed in [the] left side of [his] face and eyes" and "ordered to stop fighting." (*Id.*) Plaintiff complied. (*Id.*) Plaintiff was put in restraints and escorted to segregation. (*Id.*) From that point on, and continuing through December, Plaintiff asked to be placed in protective custody. (*Id.*) Non-party PC Davison, Defendant Clark and the Security Classification Committee refused to place Plaintiff

3

in protective custody. (*Id.*) Plaintiff received multiple misconduct tickets for refusing to return to general population. (*Id.*)

The Michigan State Police interviewed Plaintiff regarding the attack, but Plaintiff declined to press charges. (*Id.*)

Plaintiff continued to request protective custody; but Defendant Clark, non-party PC Davison, and the Deputy Warden denied that request. (*Id.*, PageID.7–8.) At the beginning of December, Plaintiff was transferred to IBC. (*Id.*, PageID.8.)

Plaintiff reports that he was also harassed while he was at IBC. (*Id.*) Although, generally, Plaintiff does not identify the harassers, he notes that Defendants Valdez and Unknown C/O did the following at IBC:

1. On New Year's Eve, Plaintiff stopped and asked Defendant Valdez for a snack bag. Defendant Valdez replied, "You can get the f*** out of my face."

2. On New Year's Day, Defendant Valdez was "working the phones." Defendant Valdez turned on the phone that Plaintiff was attempting to use to call his sister. As Plaintiff's sister picked up, Plaintiff was attacked from behind. Defendant Valdez and Unknown C/O used excessive force against Plaintiff while he was being attacked by another prisoner and, after the incident, while they took Plaintiff to healthcare.

(*Id.*, PageID.8–9 (asterisks added).) Plaintiff required offsite medical care and he could not eat solid food for four months.

In Plaintiff's "Statement of Claim," (*id.*, PageID.10), Plaintiff explains that Defendants Kinsella, Woodard, Ellison, and Clark were deliberately indifferent to the serious risk of harm that followed the disclosure that Plaintiff had been convicted of criminal sexual conduct.[1] With regard

---

[1] Because Plaintiff specifically identifies the claims that he intends to bring against these Defendants in this suit, the Court does not construe Plaintiff's complaint to raise any other claims.

to Defendants Valdez and Unknown Corrections Officer, Plaintiff focuses his claims on their excessive use of force against him.

Plaintiff seeks compensatory and punitive damages.

## II.    Misjoinder

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in a single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims. Rule 20(a)(2) governs when multiple defendants may be joined in one action:

> [p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2). Rule 18(a) states: "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a).

Courts have recognized that, where multiple parties are named, as in this case, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action. It is not concerned with joinder of claims, which is governed by Rule 18. Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18. . . .
>
> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all.

7 Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1655 (3d ed. 2001), *quoted in Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009), *and Garcia v. Munoz*, No. 08-1648, 2008 WL 2064476, at *3 (D.N.J. May 14, 2008); *see also United States v. Mississippi*, 380 U.S. 128, 142–43 (1965) (discussing that joinder of defendants is permitted by Rule 20 if both commonality and same transaction requirements are satisfied); *UWM Student Ass'n*

*v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018) ("'Unrelated claims against different defendants belong in different suits.' . . . A district judge necessarily has considerable discretion in applying Rules 18 and 20. The rules 'operate[] independently' because Rule 20 contains limitations that Rule 18 does not, and the Rule 20 inquiry comes first." (citations omitted, brackets in original)).

Therefore, "a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim or claims against the first defendant and involves a common question of law or fact." *Proctor*, 661 F. Supp. 2d at 778 (internal quotation marks omitted). When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, "the time period during which the alleged acts occurred; whether the acts . . . are related; whether more than one act . . . is alleged; whether the same supervisors were involved, and whether the defendants were at different geographical locations." *Id.* (citation omitted).

Permitting improper joinder in a prisoner civil rights action undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts. *See Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004). The Seventh Circuit has explained that a prisoner like plaintiff may not join in one complaint all of the defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produce[s] but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) . . . .
>
> A buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D

6

>  failed to pay a debt, and E infringed his copyright, all in different transactions—
> should be rejected if filed by a prisoner.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Brown v. Blaine*, 185 F. App'x 166, 168–69 (3d Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based on actions taken after the filing of his original complaint would have defeated the purpose of the three strikes provision of PLRA).

Under these circumstances, to allow Plaintiff to proceed with improperly joined claims and Defendants in a single action would permit him to circumvent the PLRA's filing fee provisions and allow him to avoid having to incur a "strike" for purposes of § 1915(g), should his misjoined claims be dismissed as frivolous or for failure to state a claim. Courts are therefore obligated to reject misjoined claims like Plaintiff's. *See Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011).

Here, Defendant Kinsella is the first party mentioned in Plaintiff's factual allegations. (*See* Compl., ECF No. 1, PageID.5.)[2] Plaintiff alleges that when Plaintiff was incarcerated at URF, Defendant Kinsella revealed to Plaintiff's cellmate that Plaintiff had been convicted of a criminal sexual conduct crime. (*Id.*) Plaintiff contends that the revelation "placed [him] with a target on his back." (*Id.* PageID.10.) Plaintiff claims that Defendant Kinsella was aware of the serious risk of harm but failed to protect Plaintiff from that risk, thereby violating Plaintiff's Eighth Amendment rights.

Plaintiff states that Defendants Woodard and Ellison were also aware of the serious risk of harm that Kinsella caused and failed to protect Plaintiff from that harm. (*Id.*) Plaintiff's claims against Defendants Woodard and Ellison are proximate in time and relate to the same risk of harm.

---

[2] The analysis of joinder must start somewhere. By accepting the first-mentioned Defendant and the factual allegations against the first-mentioned Defendant as the foundation for the joinder analysis, the Court is considering the issue of joinder of parties as Plaintiff has presented it in his complaint.

7

Accordingly, the Court finds that Plaintiff's allegations against Defendants Woodard and Ellisoni are transactionally related to Plaintiff's claim against Defendant Kinsella and that the claims involve common questions of law and fact.

Plaintiff alleges that the same serious risk of harm prompted his requests to be placed in protective custody. Plaintiff states that Defendant Clark was negligent because he failed to assist Plaintiff by putting him in protective custody. (*Id.*) Plaintiff does not state when Defendant Clark refused Plaintiff protective custody, but Plaintiff suggests that his requests and Defendant Clark's refusal to put Plaintiff in protective custody continued from the night of the fight "on through December." (*Id.* PageID.7.) Because Plaintiff's claim against Defendant Clark arose at the same facility within temporal proximity to his claim against Defendant Kinsella, and relates to the same risk of harm, the Court finds that Plaintiff's claim against Defendant Clark is transactionally related to Plaintiff's claim against Defendant Kinsella and that the claims involve common questions of law and fact.

As to Defendants Valdez and Unknown Corrections Officer, Plaintiff alleges that when he was incarcerated at IBC, Defendants Valdez and Unknown Corrections Officer used excessive force against Plaintiff in violation of Plaintiff's Eighth Amendment rights. Plaintiff's claim against Defendants Valdez and Unknown Corrections Officer arises from the same constitutional amendment, but the incidents occurred at a different facility, IBC, and more than a year after the incidents relating to the other Defendants. Plaintiff has alleged no facts that connect his claim against Defendant Kinsella to his claim against Defendants Valdez and Unknown Corrections Officer. The claims are remote in time and place. The Court finds that Plaintiff's claims against Defendants Valdez and Unknown Corrections Officer are not transactionally related to Plaintiff's claims against Defendant Kinsella nor do the IBC claims involve questions of law or fact in

common with the URF claims. Accordingly, the Court concludes that Defendants Valdez and Unknown Corrections Officer are misjoined.

Because the Court has concluded that Plaintiff has improperly joined Defendants Valdez and Unknown Corrections Officer, the Court must determine an appropriate remedy. Under Rule 21 of the Federal Rules of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21. Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) ("By now, 'it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time . . . .'" (citation omitted)); *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) ("[D]ismissal of claims against misjoined parties is appropriate."). "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.'" *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV*, 467 F.3d at 845. Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice. *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846–47.

9

Plaintiff brings this action under 42 U.S.C. § 1983. For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* Mich. Comp. Laws § 600.5805(2); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

Plaintiff's allegations against Defendants Valdez and Unknown Corrections Officer relate to events that occurred in 2025. (Compl., ECF No. 1, PageID8–9.) Plaintiff's complaint provides no indication that the statute of limitations has or will run on Plaintiff's claims against the misjoined Defendants. Therefore, Plaintiff has provided no basis for this Court to conclude that he would suffer gratuitous harm if his claims against the misjoined Defendants are dismissed without prejudice. Accordingly, the Court will exercise its discretion under Rule 21 and drop Defendants Valdez and Unknown Corrections Officer, because they are misjoined. The Court will dismiss Plaintiff's claims against these individuals without prejudice to the institution of a new, separate lawsuit.

### III.    Failure to State a Claim

Turning to the Court's review of the properly joined Defendants and claims, a complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."

10

*Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiff's claims that Defendants Kinsella, Woodard, Ellison, and Clark violated Plaintiff's Eighth Amendment right by failing to protect Plaintiff from a serious risk of harm.

Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). For a prisoner to state an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with

11

"'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993). Deliberate indifference is a higher standard than negligence and requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Bishop v. Hackel*, 636 F.3d 757, 766–67 (6th Cir. 2011).

Plaintiff alleges that Defendant Kinsella created the serious risk of harm by revealing to Plaintiff's cellmate that Plaintiff had been convicted of criminal sexual conduct. The risk created by that revelation is not immediately apparent. At the end of 2023, there were literally thousands of MDOC inmates incarcerated for criminal sexual conduct convictions; indeed, the only more prevalent category of criminal conviction was homicide. *See* MDOC 2023 Statistical Report, Section C, Prisoner Population, Tables C1a through C1c, available at https://www.michigan.gov/corrections/public-information/statistics-and-reports/statistical-reports (select "2023 Statistical Report") (last visited Sept. 26, 2025). Nonetheless, it is clear that the revelation caused Plaintiff's cellmate some concern because Plaintiff alleges that it led to an argument and the cellmate's instruction that Plaintiff should not return to the cell. It is a reasonable inference that informing another inmate of Plaintiff's conviction for criminal sexual conduct did not improve Plaintiff's standing with his cellmate or others.

A prison official informing one prisoner that another had committed a particularly heinous crime could create a serious risk of harm. For example, in *Leary v. Livingston Cnty.*, 528 F.3d 438 (6th Cir. 2008), the Sixth Circuit considered pretrial detainee Leary's claim that Defendants Stone and McGuckin had advised Leary that if other inmates found out that Leary had been charged with

12

raping a nine-year-old girl, he would likely be assaulted and would need protection. *Leary*, 528 F.3d at 442. Despite the warnings, Defendant Stone "proceeded to tell other inmates that Leary 'was in for raping a nine year old girl.'" *Id*. at 441. The inmates beat Leary severely. *Id*.

The Sixth Circuit explained that Leary had established a cognizable claim of deliberate indifference:

> Objectively, the harm facing Leary was "sufficiently serious." [*Farmer*, 511 U.S.] at 834 (internal quotation marks omitted). Stone told two inmates, Duane Kimmel and Ross Hinchey, that Leary had been charged with raping a nine-year-old girl. McGuckin verified the risk of serious harm that Leary would face if the inmates learned of his charges: He "told [Leary] to keep his mouth shut about his charges . . . [f]or his own safety" because he "fear[ed that someone might] assault[ ] him [for] a charge like that." JA 696–97. Stone's statement to Leary that "once other inmates found out what he did[,] there would be no protection from anyone here at the jail," JA 391, confirmed that the inmates' knowledge of such charges posed an objectively serious risk of harm.
>
> Subjectively, Stone's own words show he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that he "dr[ew] the inference." *Farmer*, 511 U.S. at 837. "[O]nce other inmates found out what [Leary] did," Stone knew there was reason to believe that Leary would need "protection . . . at the jail," JA 391, and he persisted in telling other inmates about Leary's charges despite that knowledge. Nor does the record offer any evidence that Stone took any reasonable steps to protect Leary from the known substantial risk of serious harm.

*Id.* at 442.

Certainly, if Plaintiff alleged that Defendant Kinsella disclosed to Plaintiff's cellmate that Plaintiff had raped a child, it might be reasonable to infer that such a disclosure created a substantial risk of harm.[3] Moreover such a risk might be so obvious that it would also be reasonable to infer that Kinsella was aware of the risk and disregarded it. But that is not Plaintiff's allegation. Plaintiff alleges only that Kinsella revealed to Plaintiff's cellmate that Plaintiff had been convicted

---

[3] Plaintiff is well-aware of the *Leary* decision. He cites it in support of his motion for summary judgment. (Mot., ECF No. 7, PageID.25.) He simply fails to acknowledge the factual differences between his allegations and Leary's.

of criminal sexual conduct, a very common circumstance in MDOC correctional facilities. Plaintiff has not alleged facts that support an inference that such a revelation objectively created a serious risk of harm, that Kinsella was aware of that risk, or that he disregarded that risk. Indeed, Plaintiff does not allege that his cellmate threatened harm to Plaintiff because of the revelation. He alleges only that his cellmate no longer wanted to continue living in the same cell.

With regard to Defendant Woodard, Plaintiff does not allege that he told Defendant Woodard that he feared for his safety. Instead, Plaintiff told Defendant Woodard that Plaintiff had a "conflict with [his] cellmate." (Compl., ECF No. 1, PageID.6.) Defendant Woodard told Plaintiff to go get his meds. (*Id.*) Upon Plaintiff's return from medline, Defendant Woodard instructed Plaintiff to sit in the dayroom next to the officer's desk. (*Id.*) Even if Defendant Woodard had interpreted Plaintiff's reported "conflict" as presenting a risk of harm, Defendant Woodard's response does not support an inference that he disregarded that risk.

Defendant Ellison entered the dayroom and instructed Plaintiff to return to his cell. (*Id.*) Plaintiff does not allege that he told Defendant Ellison about the conflict with his cellmate or any anticipated risk of harm. Instead, Plaintiff told Defendant Ellison that Defendant Woodard had instructed Plaintiff to sit in the dayroom. (*Id.*) Plaintiff has alleged no facts that might support an inference that Defendant Ellison was aware of a risk of harm to Plaintiff or that Defendant Ellison then disregarded that risk. Plaintiff does note that Defendant Ellison smiled when he ordered Plaintiff to return to his cell; but a smile is simply not a sufficient foundation to support an inference that Defendant Ellison knew Plaintiff faced a significant risk of harm or that such a risk of harm was disregarded.

Moreover, it is apparent that Plaintiff's concern regarding the conflict with his cellmate was not disregarded at all, because Plaintiff reports that upon returning to his cell, he started

14

packing his belongings. (*Id.*) Plaintiff does not allege facts that his cellmate posed a risk of harm upon Plaintiff's return. To the contrary, Plaintiff notes that his cellmate simply left the cell, perhaps because it was "yard" time for the unit. (*Id.*)

As Plaintiff finished gathering his belongings, another prisoner from across the hall attacked Plaintiff. (*Id.*) Plaintiff does not allege any facts that support an inference that the attack was prompted by the revelation of Plaintiff's criminal sexual conduct conviction. Rather, Plaintiff states that he gained the upper hand against his attacker and, then, the attacker stated that he was sent to "get [Plaintiff] off the yard and lockup." (*Id.* PageID.6–7.) Plaintiff does not allege who sent the attacker or why the attacker attacked Plaintiff.

Defendants Kinsella and Ellison arrived at Plaintiff's cell as the fight proceeded. (*Id.* PageID.7.) They sprayed Plaintiff in the "left side of [his] face and eyes [and] ordered [Plaintiff] to stop fighting." (*Id.*) Plaintiff stopped; Defendants restrained him and escorted him to segregation. (*Id.*)

Plaintiff offers one possible interpretation of these events: the Defendants engineered an assault on Plaintiff by another inmate through Defendant Kinsella's disclosure that Plaintiff was convicted of criminal sexual conduct. But Plaintiff has not alleged facts that make that interpretation plausible. Plaintiff's invited inference that the attack was prompted by Kinsella's disclosure of the generic category of Plaintiff's criminal offense is certainly possible, but it is purely speculative. And, "possible," is not enough to state a claim. A complaint that only "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Here, Plaintiff's allegations "standing alone do not move the claim from possible and conceivable to plausible and cognizable." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022)

15

(citing *Twombly*, 550 U.S. at 570). Accordingly, Plaintiff has failed to state a claim against Defendants Kinsella, Woodard, or Ellison upon which relief may be granted.

Plaintiff's claim against Defendant Clark also lacks factual allegations to support the inference that Defendant Clark was aware that Plaintiff would be at a substantial risk of serious harm if he were released to general population. Plaintiff does not allege facts to support the inference that Defendant Clark was releasing Plaintiff to the same cell or unit where he had been attacked or where the attacking prisoner, or Plaintiff's former cellmate, were located. Plaintiff does not allege facts that support the inference that Plaintiff provided Defendant Clark with any facts regarding why Plaintiff was attacked or why he feared attack from any prisoner other than his former cellmate or the prisoner who had previously attacked Plaintiff. Once again, it is not impossible that Plaintiff was subject to a risk of harm if he were released to general population, but he does not allege that he told Defendant Clark of the nature of such a risk nor, based on Plaintiff's scant factual allegations, is such a risk obvious. Accordingly, Plaintiff has failed to state a claim against Defendant Clark upon which relief may be granted.

### IV.    Pending Motions

Plaintiff has moved for summary judgment (ECF No. 7) and for the prompt scheduling of mediation or trial (ECF No. 9). Because the Court concludes that Plaintiff's claims will be dismissed for misjoinder or failure to state a claim, Plaintiff's motions will be denied as moot.

### Conclusion

Plaintiff's motion for summary judgment (ECF No. 7) and Plaintiff's motion to schedule mediation or trial (ECF No. 9) will be denied as moot. Further, having conducted the review required by the PLRA, the Court determines that Plaintiff's complaint will be dismissed without prejudice for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith

within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $605.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11.

An order and judgment consistent with this opinion will be entered.

Dated: September 30, 2025                      /s/ Hala Y. Jarbou
                                               HALA Y. JARBOU
                                               CHIEF UNITED STATES DISTRICT JUDGE